COUNTY OF OAKLAND *v.* MACK.

1. DEEDS—REVERTER—CONDITION SUBSEQUENT—RIGHT OF REVERTER
BEFORE BREACH NOT ASSIGNABLE.
   Where lands are conveyed on condition subsequent with
   right of reverter on breach of condition, the right, before
   breach, is not assignable, because there is nothing to
   assign.

2. TRUSTS—RIGHT OF REVERTER MAY NOT BE SUBJECT OF TRUST
BECAUSE NOT ASSIGNABLE.
   A trust cannot be created in a right of reverter, because
   only valuable property that can be assigned may be the
   subject-matter of a trust.

3. SAME—TRUSTEE MAY ASSERT RIGHT OF REVERTER ON BREACH OF
CONDITION DURING TRUSTEESHIP.
   Where a trustee, as such, conveyed land on condition sub-
   sequent with right of reverter on breach, the trustee might
   have asserted the right during his trusteeship had there
   been breach of condition.

4. SAME—UNDER COMMON LAW ON DEATH OF TRUSTEE TITLE TO
TRUST PROPERTY DEVOLVED ON HEIRS SUBJECT TO TRUST.
   On the death of a trustee in 1826 the trust was subject to
   the rules of the common law, and thereunder the title to
   real estate held by him in trust devolved upon his heirs
   at law, but with the trust impressed upon it.

5. DEEDS—RIGHT OF REVERTER PASSES TO HEIRS.
   Although the right of reverter on breach of condition sub-
   sequent in a deed may not be assigned, it will pass to heirs.

6. TRUSTS—RIGHT OF REVERTER PASSED TO HEIRS OF TRUSTEE SUB-
JECT TO TRUST.
   Where, under the common law, on the death of a trustee,
   the legal title to real estate held by him in trust devolved
   upon his heirs at law, impressed with the trust, so also
   the right of reverter, or of re-entry on condition broken,
   passed to his heirs, also impressed with the trust.

As to effect of attempted conveyance to extinguish a possibility
of reverter upon breach of condition subsequent, see annotation
in L. R. A. 1916B, 311; 38 A. L. R. 1112.

7. SAME — ESTOPPEL — BENEFICIARIES ACCEPTING BENEFITS UNDER TRUST ARE ESTOPPED TO QUESTION VALIDITY OF INSTRUMENTS CREATING TRUST.

Beneficiaries who accept benefits because of a trust are estopped to question the validity of the instruments by which the trustee was appointed, and by which he acquired title to the trust property.

8. DEEDS — ATTEMPTED TRANSFER OF RIGHT OF REVERTER EXTINGUISHED THE RIGHT.

An attempted transfer by the heirs of a trustee, to whom, under the then rule of law the title passed, of a right of reverter before breach did not-convey, because the right before breach cannot be conveyed, and the attempt to convey extinguished the right itself.

9. SAME—CONDITIONS SUBSEQUENT NOT FAVORED BY COURTS OR STATUTES.

Conditions subsequent are not favored by the courts nor by statute (3 Comp. Laws 1915, § 11564).

10. SAME—QUIETING TITLE—RIGHT OF REVERTER EXTINGUISHED.

In a suit by a county to quiet title to land conveyed to it on condition that title should revert in case it ceased to be used for courthouse and jail purposes, and which it now desires to sell because insufficient for said purposes, where it appears that the right of reverter was extinguished by an attempt to convey it before breach of the condition, plaintiff is entitled to a decree.

FELLOWS, WIEST, and POTTER, JJ., dissenting in part.

Appeal from Oakland; Lamb (Fred S.), J., presiding. Submitted June 10, 1927. (Docket No. 62, Calendar No. 33,163.) Resubmitted March 27, 1928. Decided July 24, 1928.

Bill by the county of Oakland against Stephen Mack and others to quiet title to land. From a decree for plaintiff, defendants appeal. Affirmed.

*Perry & Lynch*, for plaintiff.

*Samuel H. Rhoads, John Wendell Bird*, and *John J. Petrik*, for defendants.

CLARK, J.    The bill of complaint is filed by the county of Oakland to quiet its title to lots 117, 134, and 135 of the original plat of the village, now city, of Pontiac.    The lots are the site of the county courthouse and jail.    Plaintiff had decree.    Defendants have appealed.

On November 5, 1818, Stephen Mack and 14 other men entered into a voluntary association, which they designated as Pontiac Company, to purchase lands. Mack was appointed trustee of the company and title to lands was to be taken in his name as trustee; 1,280 acres were purchased accordingly.    Mack executed a declaration of trust to the company.    After acquiring the lands the company made provision for laying out a town to be known as Pontiac.    To advance their interests, members of the company solicited of Hon. Lewis Cass, governor over the territory of Michigan, that the county of Oakland be set off and that the prospective village of Pontiac be selected as county seat, and, to give weight to their solicitations, offered to donate a site or sites for a county jail and a courthouse, and to donate funds.

They were successful.    On June 30, 1823, Mack as trustee deeded the lots to certain commissioners for the county.    We quote from the deed:

"To have and to hold the above granted and conveyed lots and premises, each and every of them and every part and parcel thereof with the appurtenances unto them the said Enoch Hotchkiss, Ziba Swan and Jonathan Perin, being county commissioners as aforesaid in and for the said county aforesaid, and to their successors in office forever upon trust and confidence nevertheless that the said county commissioners or their successors in office shall cause to be erected on the aforesaid lots numbered 134 and 135 a courthouse for the use of the said county of Oakland and that the said two lots shall be appropriated to no other use or purpose whatever, and that the said county commissioners or their successors in office shall cause to be erected on the said above mentioned lot numbered

117, a jail for the use of the said county, and that the said last mentioned lot shall be appropriated to no other use whatever, and that the said county commissioners and their successors in office shall hold, occupy, possess, rent, lease or sell and convey all or each and every of said lots numbered 29, 30, 31, 32, 33 and 34, to and for the sole use and benefit and behalf of the said county of Oakland and not otherwise. And if the above granted and described lots of land or any or either of them be at any time used, appropriated or sold otherwise than is herein expressed, limited and declared, then the same shall revert back to the said Stephen Mack, trustee, trustee of the said Pontiac Company as above mentioned."

The county promptly caused to be erected a jail on lot 117 and a courthouse on the other lots.

Mack died in 1826. No provision had been made for a successor as trustee. He left a widow and children. The legislative council of the territory passed an act (2 Terr. Laws, p. 329), approved March 31, 1827, from which we quote:

"Be it enacted by the legislative council of the Territory of Michigan, that Almon Mack, and John M. Mack, administrators of the estate of the said Stephen Mack, deceased, be and they are hereby authorized and empowered to make good and valid conveyances, in fee simple, of all and every part of the above described lands, not heretofore conveyed by the said Stephen Mack, deceased, and of all other lands by him, the said Stephen Mack, held in trust for the said association, called 'The Pontiac Company,' to Elon Farnsworth, in trust for and to the use of said Pontiac Company, and the members thereof, and the respective assignees of the several members thereof, being the present proprietors; and said deed of said administrators shall be good and valid in law, for the purposes therein expressed, and taken and received as such in all courts of law and equity in this Territory.

"SEC. 2. That the said Elon Farnsworth, trustee of said Pontiac Company, as aforesaid, be and he is hereby authorized and empowered to make good and valid conveyances, in fee, of all and every part of said lands which may be conveyed to him as trustee,

as aforesaid, by the said Almon Mack and John Mack, administrators, as aforesaid, to the several persons to whom they may equitably and justly belong and appertain, as the said association, or a majority thereof, shall from time to time direct."

Pursuant to such legislative act, and on April 15, 1827, said John M. Mack and Almon Mack, sons and administrators of deceased, gave to Farnsworth, as trustee, a deed, executed also by the widow of Stephen Mack and by the wives of said grantors, which deed purported to convey:

"Being all the lands not heretofore conveyed by the said Stephen Mack in execution and in pursuance of his said trust which are included in section twenty-nine, the northeast quarter of section thirty-two, the northeast, northwest and southwest quarter sections of section twenty-eight and the southeast quarter of section twenty, all in township number three north of range ten east and all lying in that part of the Territory of Michigan now included in the county of Oakland. And also all other lands which were held by the said Stephen Mack at the time of his death in trust for the said association called the Pontiac Company, together with all the privileges and appurtenances to the said lands in anywise appertaining and belonging."

In 1841 the county desired to erect other buildings on lots 134 and 135 and Farnsworth as trustee gave to the county a quitclaim deed of such lots, but it was recited in the deed:

"The interest here intended to be conveyed is the right to erect upon said lots public offices for the use of said county of Oakland by the said county commissioners and their successors in office and it being hereby expressly understood that this conveyance shall not in anywise divest the company of said land, but on the contrary it is declared if said premises are used and occupied for any purpose whatever other than mentioned in the deed to said county commissioners dated the thirtieth of June, A. D. 1823, and recorded in the register's office for said county in Liber A, Folios

83, 84, 85, 86 and 87 and for the erection of public offices as hereinbefore mentioned, that the same shall revert to said Pontiac Company as mentioned in said deed hereinbefore referred to. The reversionary in trust in said lots being part of the said lands held in trust, as aforesaid."

From 1823 to the present time the county has had and occupied the lots for the said uses and purposes. Now, it is stated, greater buildings are required, the lots are not sufficient in size and are not well located, the particulars of which need not be discussed. The county, it seems, desires to dispose of the lots and buildings now near the center of an active business and industrial district and to acquire a new location for its county buildings, and it seeks to be relieved of record of the reverter in the deed of Mack, trustee.

The lots were conveyed to the county on condition subsequent with right of reverter in Mack as trustee on breach of condition. This right before breach was not assignable. *Halpin* v. *School District,* 224 Mich. 308; 23 R. C. L. p. 1104. Under the general rule a trust cannot be created in a right of reverter, because only valuable property that can be assigned may be the subject-matter of a trust. 1 Perry on Trusts (6th Ed.), § 67. But as this right of reverter accrued to the trustee after the creation of the trust relation and as it was carved out of trust property Mack, as trustee, might have asserted the right during his trusteeship had there been breach of condition, for the reason that no assignment of the reverter would have been there involved.

Counsel seem to agree that when Mack died in 1826 the trust was subject to the rules of the common law. Defendants' counsel say that under such rules, and on the death of Mack, sole trustee, the title to the real estate held by him in trust devolved upon his heirs at law; true, but with the trust impressed upon it. 1 Perry on Trusts (6th Ed.), § 343; *Cameron* v. *Hicks,*

141 N. C. 21 (53 S. E. 728, 7 L. R. A. [N. S.] 407);
26 R. C. L. p. 1277.    Had Mack conveyed by deed his
own land and reserved to himself and inserted in the
deed a condition subsequent, the right of reverter, or
the right to take advantage of the condition would have
belonged to him and to his heirs.    Although such right
may not be assigned, it will pass to heirs.    *Wagner*
v. *Wallowa County*, 76 Or. 453 (148 Pac. 1140, L. R.
A. 1916F, 303).    So in the case before us, the legal
title to the real estate having devolved upon Mack's
heirs at his death, the right of reverter, or of re-entry
on condition broken, also passed to his heirs, all im-
pressed with the trust.

By the deed of Mack's representatives, and others,
it was intended to assign and convey to Farnsworth,
trustee, all lands remaining as well as all rights and
privileges in Mack as trustee at his death.    It was
intended that Farnsworth be trustee.    It was not in-
tended that Mack's heirs be trustees in any way or
of anything.    That was the understanding of Farns-
worth, trustee and grantee in such deed, as shown
by the recitals in his later deed to the county, purport-
ing to surrender, partially, the right of reverter.    We
agree with the opinion of the trial judge, with respect
to the deed to Farnsworth, of the purport of its terms:

"This conveyance carried with it all rights, privileges
and appurtenances, which might be in anywise resting
in the trust estate, held by Stephen Mack, at the time
of his death, in any of the lands and premises of which
he had been trustee for the use and benefit of the
Pontiac Company."

This right or privilege of reverter (*Wagner* v.
*Wallowa County, supra*), carved out of trust property,
was in Mack as trustee when he died and it was one
of the rights or privileges attempted to be conveyed.
The act of the legislative council did not attempt to
declare that the condition before breach was an estate
or interest in land, it did not attempt to give sub-

stance to something which had no being, neither did it abrogate the settled rule of law respecting conveyance of such right before breach. It seems clear that the beneficiaries of the trust (and heirs of Mack would succeed to his interest as beneficiary) who accepted benefits because of the trust and under Farnsworth's trusteeship were, long since, estopped to question the validity of the instruments by which he was appointed and by which he acquired title. And at this time for other considerations which will suggest themselves, such validity could not well be challenged. It is admitted that the deed conveyed to Farnsworth, trustee, all lands which had not been conveyed by Mack, trustee.

The attempted transfer or conveyance of the right of reverter did not convey. The right before breach cannot be conveyed. And the attempt to convey extinguished the right itself. See *Halpin* v. *School District, supra,* and we quote from 1 Tiffany on the Modern Law of Real Property, § 75, cited with approval in *Wagner* v. *Wallowa County, supra:*

"The right to take advantage of a condition subsequent belongs, at common law, exclusively to the grantor or lessor and his heirs, and he cannot reserve such right to others, even by express stipulation. Nor can the right to enforce a forfeiture, or, as it is usually called, the right of re-entry, be, at common law, assigned or transferred by the grantor to a third person before entry for the breach; this being in conformity with the common-law rule that 'nothing' in action, entry, or re-entry can be granted over. These restrictions as to the persons able to take advantage of a breach, and the inability to assign the right, have been generally recognized in this country, and not only will an attempted assignment of the right of re-entry be void, but it will have the effect of destroying the grantor's right to enforce the condition, which is thereafter in effect nonexistent."

Conditions subsequent are not favored by the courts,

nor by statute (3 Comp. Laws 1915, § 11564). Frequently the condition survives any substantial or actual benefit to the grantor and his heirs and becomes an onerous burden upon the grantee and his assigns, whose prayer for relief is appealing. This, in some degree, may account for the arbitrary rule that an attempt to convey destroys the right. And the author of a note in 38 A. L. R. 1112 states with ample citation of cases:

"It may be also noted in this connection that, wherever the point has directly arisen, it has been held that the effect of a subsequent conveyance by the grantor of the property, subject to the condition, is to destroy the condition."

In a note L. R. A. 1916F, 311, 312, there is criticism of the rule, but the author says:

"All the American courts which have had occasion to pass upon the question have, practically without dissent, decided it in the same way."

The rule is settled in this jurisdiction. *Halpin* v. *School District, supra.* It should be understood that in the case at bar there was something more than the appointment of one trustee to succeed another, as practiced and understood under the present state of the law. The title to the land charged with the trust passed under the then rule of law to Mack's heirs on his death. It was necessary, in order to pass title to Farnsworth, that a conveyance be made. The deed or assignment was before condition broken, when there was nothing in respect of the condition capable of assignment, and, as we have stated, under settled law the attempt to convey destroyed the right.

Relative to the suggestion that an exception to the rule ought to be made here because of the relation of the parties interested, we call attention to a leading case (*Rice* v. *Railroad Co.*, 12 Allen [Mass.], 141), where it was held, quoting syllabus:

"The right or possibility of reverter which belongs to a grantor of land on condition subsequent is extinguished by a conveyance thereof by deed to a third person before entry for breach of condition; even though such conveyance be to a son of the grantor, who upon the grantor's death becomes his heir."

In *Hooper* v. *Cummings*, 45 Me. 359, a father conveyed to his son before breach lands to which such a condition was attached. It was held that the grantor could make no entry or claim as he had no interest, neither could the son, as he was a stranger to the condition.

In *Southard* v. *Railroad Co.*, 26 N. J. Law, 1, it was said that the grantor's devisee, who was his widow, could not avail herself of a breach of the condition for she claimed as devisee and not as heir.

In *Walker Branch* v. *Wesleyan Cemetery Directors*, reported in 29 Ohio Law Journal, 397, it was held, citing many authorities, that the right is not transferable by "alienation or devise." The right may be exercised only by the grantor "or his heirs—not by a stranger." *Craig* v. *Inhabitants of Franklin Co.*, 58 Me. 479. The beneficiaries of the trust had no power to avoid the conveyance on breach of condition; that right could be exercised only by the trustee or his heirs. *Welch* v. *Silliman*, 2 Hill (N. Y.), 491.

The right of reverter having been extinguished, we need not consider the effect of the deed or release of Farnsworth to the plaintiff, nor need we discuss the effect of the recital therein that the right of reverter was in the Pontiac Company rather than in the trustee.

Decree affirmed. No costs.

FEAD, C. J., and NORTH, MCDONALD, and SHARPE, JJ., concurred with CLARK, J.

WIEST, J. (*dissenting in part*). This is an appeal from a decree in the Oakland circuit quieting title in

the county of Oakland to lands occupied by the court-house and county jail.    The donation deed to the county, over a century ago, contained a naked possibility of reverter upon breach of condition subsequent. It is claimed that the premises are no longer suitable for courthouse and jail purposes and disposition thereof is desired, but the possibility of reverter, as it stands in the deed, clouds the title.    The bill may be considered one to reform the deed and quiet title.    We are convinced that the possibility of reverter was incorporated in the deed contrary to the rights of the county and against the express direction of the Pontiac Company, the real grantor.    If the deed is reformed to accord with the purpose and direction of its execution it will carry but a covenant on the part of the county, and such covenant having been fully satisfied, title may be found in fee simple in the county.    We have before us much early history bearing upon this issue and find it necessary to refer to ancient laws, public records, authentic minutes of meetings of the Pontiac Company, and some historical data.    At the opening of the year 1818, the territory, now the county of Oakland, was a wilderness, traversed by an Indian trail with a camping ground at the present site of the city of Pontiac.    Delay of Great Britain in giving up possession of the Northwest Territory and an adverse report by the surveyor general upon the character of lands in that section had prevented surveys.    But in 1815 the principal meridian and base line were established and shortly thereafter lands in the southeastern part of the Territory of Michigan were surveyed.    May 1, 1818, President Monroe, by proclamation, authorized public auction sales of government lands in the Territory of Michigan, and thus opened purchases in what is now Oakland county.

November 5, 1818, Stephen Mack and 14 other persons, associated as the Pontiac Company, a copartner-

ship, resolved to purchase certain lands from the government and lay out a town to be called Pontiac; constituted Mr. Mack agent and trustee with power and authority to purchase, in his own name, but for the use and benefit of the Pontiac Company, certain designated lands, comprising upwards of 1,280 acres, portions of which were later platted as the village of Pontiac. In pursuance of the partnership scheme, Mr. Mack obtained a patent in his name, dated September 12, 1820. The lands were paid for by the co-partners. November 12, 1818, Mr. Mack executed a declaration of trust in which he stated his appointment by the association to purchase the land in his own name, but for the company; that on November 6, 1818, he made the purchase and was to hold the land in trust for and to the use of the said association, each and every of them, their heirs and assigns, according to their and each of their several rights and interests therein, and further

"that I will use or convey the said tract or section and quarter sections of land or parts or lots thereof by good and sufficient deeds and conveyances in law to such persons and at such times as by the orders, rules, regulations and resolutions of said association or a majority of them shall be prescribed and determined and further that in all things relating to me, the said Stephen Mack, as trustee of the said tract or section and quarter sections of land for the said association I will abide by and perform all the orders, rules, regulations and resolutions made in conformity to law which the said association or a majority of them shall have made or hereafter may make or ordain touching or concerning the uses and dispositions of said tract or section and quarter sections of land."

By virtue of this declaration of the scope and purposes of the trust, Mr. Mack was trustee under the direct control of the beneficiaries and his relation was, in effect, that of a partner with delegated authority to purchase land for the firm. Mr. Mack, as such

trustee, could exercise no power of disposition of the property except as the association authorized. This right of possession, control, and disposition of the property by the association rendered the trust a passive or nominal one.

The next step in the scheme of the association was to bring about the organization of a county and location of the seat of justice thereof in their paper planned town. The steps taken, measures adopted, inducements offered, and the success thereof are material to an understanding of our decision of this case.

We consider the case as though the Pontiac Company were in court insisting upon the right of reverter in case the site is no longer suitable for courthouse and jail purposes. Courts do not look with favor upon a naked possibility of reverter of lands donated and conveyed to a county for public purposes, and, while contracts are to be enforced, the relief must be upon the contract, and when it is clear that a deed to the public departed from the intent and purpose of the grantor and imposed a condition contrary to the offer and inducements to the county, it will, upon the application of the grantee, be reformed, and, as reformed, be made to speak the rights of the parties.

The Pontiac Company, were it here, would have to abide its own records. We now speak from the records of the company and public laws and proclamations.

The Pontiac Company, December 2, 1818, as shown by its records, requested General Macomb, Judge LeRoy, Colonel Hunt, and Major Edwards to call on Governor Cass, "respecting setting off of the county and fixing the county seat."

Governor Cass, January 12, 1819, in response to a petition requesting that the boundaries of a new county and the seat of justice thereof be established, but not to take effect until the arrival of the period when its

population would probably require such measure, stated that to do so would have a tendency to increase the population therein, "and to prevent those difficulties which sometimes arise from the establishment of counties where settlements are formed and conflicting opinions and interests are to be reconciled," designated the territory to be called the county of Oakland and appointed five commissioners to examine the county and report the "most eligible site for a seat of justice thereof," but delayed the organization of the county until December 31, 1822.    See 2 Terr. Laws, p. 798. It can readily be read between the lines that some persons were anxious to have the seat of justice fixed before conflicting opinions and interests might develop, and it is clear that the success of the plans of the company depended upon the locating of the courthouse in the tentative town of Pontiac.

Governor Cass having set off the county and appointed commissioners to locate the county seat, the next step by the company, as appears by the minutes, was taken February 1, 1819, as follows:

"Resolved, that it is expedient to address to the commissioners appointed by Governor Cass to locate the seat of justice for the county of Oakland, and to offer in behalf of the company to donate a lot in the town of Pontiac, for a prison and to erect a jail of wood on said lot for the use of the said county to cost not more than $500, and to be ready as soon as the county is organized and also to convey one corner of the public square for the use of a courthouse and to contribute liberally in erecting said building, to be regulated by the amount of the company's funds."

Mr. Mack was present at that meeting.

Evidently the commissioners, appointed by the governor to designate the seat of justice, or Governor Cass himself, wanted some assurance that the donation of the lots and the building of the jail would be carried out.    This appears by a resolution of the company at a meeting on January 26, 1820:

"Resolved that Sol. Sibley be authorized to enter into bond to the county of Oakland or to Governor Cass in trust for the county, conditioned for payment of one thousand dollars to the commissioners of the county of Oakland for account of the Pontiac Company, the same to be expended by said commissioners, to-wit: five hundred dollars in erecting a courthouse at Pontiac and five hundred dollars in erecting a jail at said place and not otherwise, according to a proposition of the company made the commissioners appointed by the governor to locate the seat of justice for the county as per resolution of the company of the 10th of February, 1819,   *   *   *.

"Resolved further that the standing committee do make out and deliver to the commissioners of the county of Oakland or Governor Cass, in trust for said county, a certificate for the following lots and parcels of ground within the town of Pontiac, to hold as evidence of their claims to a conveyance of said lots on condition that Pontiac is made the permanent seat of justice for said county pursuant to the resolution of the company of the 10th of February, 1819, to-wit: one corner of the public square, 120 feet by 140 feet on which the courthouse is to be built—one lot of 60 feet by 140 to be located and on which the jail is to be built—2 acres of land adjoining the town to be located as a burying ground; also the six lots following to be conveyed to the county to be disposed of as the commissioners of said county may think proper,   *   *   * conveyances to be made by the trustee as soon as patent is obtained, provided Pontiac shall have been declared and made the seat of justice for said county."

The organization of the county, however, was not deferred until December 31, 1822, for March 28, 1820, Governor Cass organized the county, and, in conformity to the report of the commissioners, established "the seat of justice at the town of Pontiac."   1 Terr. Laws, p. 328.

The county having been established and the seat of justice located at the town of Pontiac, the next action of the company, appearing in its records, was on June 1, 1822, as follows:

"Resolved, that the two town lots of the southwest corner of the public square in the village of Pontiac numbered 134 and 135 be designated as donation lots to the county of Oakland for the purpose of erecting a courthouse, and that the consideration of the grant or donation be expressed in the deed to the county commissioners.    *    *    *

"Resolved, that town lot No. 117 be designated as the donation lot heretofore given to the county of Oakland for the purpose of building a jail."

We now come to the action of the company with reference to the deed.    January 15, 1823, the company records show the following:

"Ordered that a deed be made out and executed by Mack, the trustee of the company, to the county commissioners of the county of Oakland, for town lots numbered 134 and 135 for the purpose of building a courthouse and town lot numbered 117 for the purpose of a jail—and town lots numbered 29, 30, 31, 32, 33 and 34 to be disposed of by said commissioners in such manner as may be most for the benefit and intent of the good peopie of the said county of Oakland—the same to be given in trust to the said commissioners and their successors in office—for the above purpose and no other."

June 30, 1823, Mack, trustee, executed the deed to the county of Oakland.    The deed recited the formation of the copartnership; the purposes thereof; the selection of Mack as agent and trustee; the declaration of trust; the purchase of the land from the government; and efforts of the company to have the county seat located at Pontiac; the offers in that behalf to the public authorities and the resolution of the company directing the execution of the deed.    The deed was to Enoch Hotchkiss, Ziber Swan, and Jonathan Perin, county commissioners,—

"and to their successors in the said office upon the trust and to the uses and purposes and intents hereinafter expressed, limited and declared to have and to hold the above granted and conveyed lots and premises,

each and every of them and every part and parcel thereof with the appurtenances unto them the said Enoch Hotchkiss, Ziber Swan and Jonathan Perin, being county commissioners as aforesaid in and for the said county aforesaid, and to their successors in office forever upon trust and confidence nevertheless that the said county commissioners or their successors in office shall cause to be erected on the aforesaid lots numbered one hundred and thirty-four and one hundred and thirty-five a courthouse for the use of the said county of Oakland and that the said two lots shall be appropriated to no other use or purpose whatever and that the said county commissioners or their successors in office shall cause to be erected on the said above mentioned lot numbered one hundred and seventeen a jail for the use of the said county and that the said last mentioned lot shall be appropriated to no other use whatever, * * * . And if the above granted and described lots of land or any or either of them be at any time used, appropriated or sold otherwise than is here expressed, limited and declared, then the same shall revert back to the said Stephen Mack, trustee, trustee of the said Pontiac Company as above mentioned."

Mr. Mack died in 1826, with the trust still operative. Under the then law the title to the lands held in trust by him devolved upon his blood representatives, charged with the same trust and in continuation thereof, if they cared to accept the same. Under present law the heirs of a deceased trustee no longer take, but the trust, if unexecuted, vests in the court of chancery. 3 Comp. Laws 1915, § 11588. March 19, 1827, the Pontiac Company directed a petition to be presented to the legislative council of the Territory of Michigan, in which was set up the fact that Mack "died seized as trustee of certain lands belonging to the association called the Pontiac Company and their assigns," and that it was necessary to settle and close the concerns of the company, and prayed for the passage of an act "authorizing John M. Mack and Almon Mack, administrators in the estate of said

Stephen Mack, deceased," to convey all the lands held by Stephen Mack, in trust, to Elon Farnsworth, as trustee of the company. March 31, 1827, the legislative council of the Territory passed the requested act, authorized the transfer and designated Elon Farnsworth trustee to succeed Mack. The administrators of Mack's estate, under the legislative authority mentioned, conveyed to the new trustee. Stephen Mack held title in a representative capacity, in trust for himself and his associate partners, and when he died the trust but awaited a new trustee. Such successor was provided by the act of the legislative council and the trust estate continued in the new trustee. It is evident from this record that the purposes of the trust terminated years ago. The purpose of the appointment of Farnsworth trustee a century ago was "to settle and close the concerns of the company."

"A trust terminates when the purposes for which it was created have been accomplished." 3 Thompson, Real Property, § 2258.

If the trust continued until 1846, then, upon the death of the trustee, the trust estate vested in the court of chancery and not in the heirs of the trustee. Rev. Stat. 1846, chap. 63, § 24; 3 Comp. Laws 1915, § 11588. The right of reverter was in the trustee for the use and benefit of the Pontiac Company, and, if not lost or the deed is not reformed, still so stands. There has been, as yet, no breach by the county. The purposes of the trust have long ceased, the purpose of the right of reverter fully served and the beneficiaries long dead. If right of reverter still exists and there should come a breach it will happen after the trust is executed and the beneficiaries all dead and the court of chancery, in which the trust is vested, will have no power to appoint a trustee. If the deed is not reformed and there comes a breach of the condition subsequent the title will revert to the trust estate, and,

as the trust ended years ago, the court of chancery would have to treat it as an executed trust and the Pontiac Company estopped by the company records from taking advantage thereof and the trustee, if one were appointed, also estopped thereby.

We are fully persuaded that the Pontiac Company intended the deed to have the covenant that the county would erect a jail and courthouse on the premises and did not intend that a condition subsequent, with right of reverter in case of breach, should be inserted for the benefit of the Pontiac Company.    The covenant in the deed has been performed by the county, and this was all the company ordered Mack to exact.    Having complied with the covenant, the title in fee simple long ago vested in the county and cannot now be divested, if, at this late day, the county finds the premises no longer suitable for courthouse and jail purposes.    We find the reverter inconsistent with the covenant, contrary to the offers inducing the location of the county seat, not only never authorized by the Pontiac Company, but in direct violation of the instructions to the trustee, and the insertion thereof in the deed was an exercise of power not in the trustee.

We think the decree should be affirmed, but not on the ground stated by Mr. Justice CLARK.    We are of the opinion that the deed should be reformed by elimination of the naked possibility of reverter.    If the right of reverter was properly inserted in the deed it was not destroyed by transfer by the heirs of Mack, trustee, to Farnsworth, trustee.    We concede the rule to be that the transfer of a naked possibility of reverter to a stranger destroys the right, but think no such thing was done.    The trust estate, inclusive of the right of reverter, if the latter was valid, was at no time out of the hands of those charged with the execution of the trust, and, therefore, never lost.    The right of reverter could not be lost in a continuation

298 MICHIGAN REPORTS. [July

of the trust from one trustee to another, or by a transfer from the heirs of the first trustee, upon whom the trust devolved by reason of the death of the first trustee, to the new and successor trustee, appointed and acting in furtherance of the trust. The reason for the rule that a naked possibility of reverter is lost, if attempted to be conveyed, is that there is nothing to pass by conveyance, and—

"After such a conveyance there is no person capable of making an entry or claim; the grantor can not, for he has parted with his interest; the grantee can not, because he is a stranger to the condition." 3 Thompson, Real Property, § 2118.

Manifestly the reason is wholly inapplicable in a case where the conveyance is to a successor of the trustee reserving the right, for he is not to be considered a stranger to the condition. The right of reverter, vested in a trustee, is never lost while in the hands of those charged with the execution of the trust.

The legislative council had power to enact the law to carry out the purposes of the trust and to that end designate a trustee to succeed Mack. Our present statute provides that the same thing may be done by the court. The legislative act was no transfer in a sense forbidden or operating as a loss of right of reverter, but proceeded on the theory that a trust of this character survives a trustee, and the legislature may let the trust rest with the heirs of a trustee or enable another to continue the trust. The partial release of the right of reverter by Farnsworth, trustee, and acceptance thereof by the county does not estop the county from having reformation of the deed given by Mack, trustee.

The deed to the county should be reformed by elimination of the naked possibility of reverter and title vested in the county in fee simple. For the reason given the decree in the circuit should be affirmed, but,

because of the public character of the suit, no costs should be awarded.

FELLOWS, J., concurred with WIEST, J.

POTTER, J. (*concurring*).    The facts herein appear from the opinions of Justices CLARK and WIEST.    Upon the execution, delivery, and acceptance of the deed to the county under which it went into possession and continued to use and occupy the' lands conveyed for more than 100 years, the county, having accepted the benefits, is bound by the burdens imposed by the instrument of conveyance.    The land was conveyed for public purposes.    The county held an estate upon condition,—one which, upon the happening of a particular event, might be destroyed.    Under the deed, its estate vested, subject to be defeated in consequence of the nonobservance of a condition subsequent.    *Blanchard* v. *Railroad Co.*, 31 Mich. 43 (18 Am. Rep. 142). When the purposes for which the land was conveyed cease, the county's estate therein ceases.    Mack was trustee of the Pontiac Company.    When he died the trust devolved upon his heirs.    Recognizing this, the legislature authorized them to convey to a new trustee.    They conveyed to Farnsworth as trustee, who died after the present statute became operative, which vests the execution of the trust in the court of chancery, subject to be re-delegated by appropriate judicial action to a new trustee.    If the county ceases to use the land for public purposes, it will be disincumbered of the county's possessory title and the right of possession will revest in the trustee. *Wanzer* v. *Blanchard*, 3 Mich. 11; *Board of Sup'rs of Kent Co.* v. *City of Grand Rapids*, 61 Mich. 144; *Hunter* v. *Trustees of Sandy Hill*, 6 Hill (N. Y.), 411; *Patrick* v. *Young Men's Christian Ass'n*, 120 Mich. 185. The land being held for public purposes, the county cannot sell it in violation of the public trust upon which

it was conveyed.   3 Dillon, Municipal Corporations (5th Ed.), § 991 *et seq.;* 3 McQuillin, Municipal Corporations (2d Ed.), p. 749; *Curry* v. *City of Highland Park,* 242 Mich. 614..

It satisfactorily appears that the condition was inserted in the deed contrary to the directions of the company.   It should be reformed, as held by Mr. Justice WIEST.   Upon being reformed in accordance with the original intention of the parties, the county will become the absolute equitable owner in fee of the whole estate in the land without restriction, condition, or limitation, and may sell and convey a full, complete, and indefeasible title thereto.   *Seebold* v. *Shitler,* 34 Pa. St. 133.

A decree reforming the deed should be taken, but without costs.